ROSEN v. CHICAGO G. W. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. September 27, 1897.)

No. 861.

1. NEGLIGENCE BY USE OF LOCOMOTIVE—ADAPTABILITY AND EQUIPMENT—THROWING SPARKS.

Where an engine used in suburban service is sufficient in size and capacity for the purpose, properly equipped, and carefully and skillfully operated, the mere fact that in its ordinary and proper operation it emits more and hotter sparks than would the ordinary and proper operation of a larger engine doing the same work, and thereby increases the danger from fire to adjacent property, does not of itself amount to negligence.

2. ACTION FOR DAMAGE BY FIRE—PRESUMPTION OF NEGLIGENCE OVERCOME.

In an action for damages by fire communicated by sparks from a locomotive, the presumption of negligence arising under the Minnesota statute is overcome by satisfactory proof that the engine was provided with suitable appliances to prevent the escape of sparks, that they were in good order, and that the engine was carefully and skillfully operated.

In Error to the Circuit Court of the United States for the District of Minnesota.

Jared How, for plaintiff in error.

Dan W. Lawler, for defendant in error.

Before SANBORN and THAYER, Circuit Judges, and RINER, District Judge.

RINER, District Judge. This action was brought by Adolph T. Rosen against the Chicago Great Western Railway Company in the circuit court of the United States for the district of Minnesota to recover damages for the destruction by fire of the plaintiff's building, situated upon land owned by him adjoining the defendant's railroad, in the city of St. Paul. The evidence in the case showed that the plaintiff was the owner of lot No. 27, with the buildings thereon, in block No. 23 of South Park addition No. 10; that the defendant owned and was operating a line of railway running from St. Paul in a southerly direction, through South St. Paul and beyond; that the plaintiff's lot was adjacent to, and on the easterly side of, the right of way of the defendant's road; that the building was a large frame building, 50 feet in width by 90 feet in length and 2½ stories in height, with a brick addition thereto 1½ stories high; that the building and addition contained a large amount of machinery, tools, material, and appliances, which were owned by the plaintiff, and used by him for the purpose of carrying on a tannery and fur-dressing establishment, the building in question being located about 50 feet westerly from the main railway tracks of the defendant company, and that on the 11th of August, 1895, within a short time after one of the defendant's trains had passed the plaintiff's building, the building was discovered to be on fire, and was wholly destroyed. There was also evidence offered by the plaintiff tending to show that among the locomotive engines used by the defendant in operating its trains was a small motor engine, known as engine No. 13, which was used by the defendant in drawing suburban trains daily operated by it and at frequent intervals from the city of St. Paul to South St. Paul and beyond, upon the main tracks of its road; that

this motor engine No. 13 was used by the defendant on the day that the plaintiff's property was destroyed, and was the engine attached to the train which passed the premises owned by him, in a southerly direction, a short time before the fire was discovered; that the property belonging to the plaintiff was of the value of about $27,000; that, at the time of the passage of the engine and train and of the destruction of the building, a strong breeze was blowing in the locality in which said building was situated, from a westerly direction, across the tracks of the defendant, and towards the building; that South St. Paul was situate about five miles southerly from the city of St. Paul; that the plaintiff's factory was situated about four miles southerly from the main depot of the defendant in the city of St. Paul; that the region between the city of St. Paul and South St. Paul, through which the defendant's road ran, and upon which a train was then being operated, was devoted largely to manufacturing purposes; that there were a number of manufacturing establishments of various kinds along the tracks of the defendant between the stations mentioned; that, as the engine was passing the building of the plaintiff, it was observed to discharge from its smokestack a large quantity of sparks and cinders, which sparks and cinders fell on and about the building; that the ordinary locomotive road engine of the smallest size used by the defendant in operating trains upon its road was one having cylinders 17 by 24 inches, and drive wheels of 64 inches, in diameter; that the motor engine No. 13 had a cylinder of only 12 by 20 inches, and drive wheels of about 49 inches, in diameter; that the power or capacity of the motor engine was only about one-half that of the smallest sized road engine; that the flues in its boiler were considerably shorter than the ordinary road engine, and its fire box considerably shallower; that in drawing a train of the size which the motor engine was engaged in operating on the 11th of August, 1895, it was necessary to push or work the motor engine much harder than it would have been necessary to have worked or pushed an ordinary road engine of the smallest size drawing the same train; that, in the harder working of the engine, the draught would be much increased; that the engine, when pushed or worked hard, would throw out a larger quantity of sparks and cinders than it would when worked with more moderation; that the quantity of sparks and cinders which would be thrown out in operating any engine when in good repair and condition depended upon the amount of force or power with which such engine was accompanied; and that an engine of the size and capacity of motor engine No. 13, in drawing the train to which it was attached at the time of the fire, would throw out a much larger quantity of sparks and cinders than an ordinary standard road engine even of the smallest size would do in drawing the same train; and that, by reason of its short flues, shallow fire box, and small drive wheels, the draught of the engine was made greater, and sparks and cinders would be carried through and thrown out of the smokestack in much greater quantities and in a much more highly-heated condition in developing the same amount of speed, than would be the case with an ordinary road engine even of the smallest size, having longer flues and a less shallow fire box.

The testimony of the engineer operating engine No. 13 on the day in question was to the effect that the train was a suburban train for the accommodation of passengers, carrying no freight; that on that day, on its south-bound trip, the engine was run in the ordinary manner; that it worked with a light throttle at all times in pulling these trains; that, in his experience, this engine worked better in that way than when it was crowded; that it was an easy matter for this engine to haul this train with two coaches; that it could easily handle three coaches and make its time; that, if there was any grade at the point in question, it was so slight that it could not be seen with the naked eye; that, at the time of passing the plaintiff's factory, he saw no sparks or cinders issuing from the smokestack; that in fact it was not possible to see such sparks or cinders, if any were thrown, in daylight, according to his experience of 16 years; that he had no recollection that any such were thrown at the time in question; that he was on the west side of his engine, or the opposite side from the factory, on both the south and north bound trips, the engine not being at the end of its run; that he saw no one in the neighborhood of the factory on his down or return trip; that his duty required him to keep a lookout on the track ahead; that from his engine he had a clear view of everything around him; that he saw no fire on the roof or any part of the factory on either the north or south bound trip; that on both trips the engine was worked as light as it was possible to work it,—that is, with a light throttle; that the engine experienced no trouble in pulling the train, which he thought consisted of two eight-wheeled coaches, though one might have been an ordinary twelve-wheeled coach; that there was nothing in regard to the throwing of the sparks or fire by this engine on either of the trips that attracted his attention; that the ordinary cinders thrown by the engine are not larger than one-eighth of an inch in diameter; that there was no difference between the spark-throwing powers of this motor engine and an ordinary locomotive engine; that they are about one and the same thing, only that the motor engine is on a smaller scale; that he ran the engine the next morning until it was called in, some time before noon; and that at noon he examined the nozzle and other parts, making as careful examination as he could, and found them in first-class order.

The fireman's evidence was to the effect that on leaving a station he generally put in about 2 shovelfuls of coal, which would be sufficient to carry it to the next place, so that on the whole trip he would use about 20 or 25 shovelfuls of coal, there being 10 stops; that they always stopped at South Park station, and stopped there on this day; that he saw no sparks or cinders thrown from the smokestack at the time in question, nor was his attention called to anything of the kind; that he did his work as fireman in the ordinary manner on that trip, was on the left-hand side of the engine on both trips, did not notice any fire or sparks on the plaintiff's factory when he went by it, and that there was nothing in the working of the engine in any way that attracted his attention as being out of the ordinary run. .

The conductor testified, in substance, that the motor cars are somewhat lighter than ordinary cars, with doors at the side; that there are

no brakemen on these motor trains; that there was nothing unusual in the running or management of the train on the day in question on the north or south bound trips; that he was familiar with locomotives in general use, and that, according to his observation, there is no difference in the manner of ejecting sparks or throwing fire between the ordinary road engine and a motor engine. The defendant also offered evidence tending to show that, when the plaintiff's building was first discovered to be on fire, the fire was not on the roof, but on the southerly gable end of the factory, in such manner as to indicate that the fire had originated on the inside of the building; that at the time of the fire the wind was blowing in a direction parallel with the factory building and the railway tracks, and not across the tracks towards the building; that, from an early hour in the morning of the day the fire occurred, the doors and windows of the factory were open, and two or more workmen were employed in and about the factory during that day, before and at the time of the fire; that the motor engine No. 13 was of a modern type, fitted with the best and approved modern appliances in general use for the prevention of the escape of fire or sparks; that said appliances had been thoroughly overhauled and replaced shortly before the fire; that upon an examination of the engine, made immediately before and immediately after the fire, all of the appliances for arresting the escape of fire were found in perfect order and condition; that, at the time the examination was made after the fire, no change or alteration had been made in the appliances; and that, on the day the fire occurred, the engine was properly and skillfully managed, by careful and competent operators.

At the close of the testimony, the plaintiff requested the court to instruct the jury:

"(1) If the jury find from the testimony that, in order to do the work performed by engine No. 13 in the motor service, it was necessary to so operate said engine, or the ordinary operation of said engine was such, as to cause it to throw out a greater quantity of sparks than would have been thrown out in the ordinary and proper operation of a larger engine, or one of a different construction, doing the same work, and the throwing out of such a greater quantity of sparks would increase the danger from fire caused by the engine to adjacent property, the failure to make use of such larger engine, or of different construction, for the purpose of doing the work performed by **13**, is an act of negligence on the part of the defendant company."

"(2) When the fire is shown to have originated from sparks from the engine, it must be presumed to have been caused by some negligence of the company or its employés, either in the character, construction, or management of the engine, unless the contrary is shown to your satisfaction; and the burden of proof is on the defendant to show that it was not negligent in any particular that may have operated to cause the injury."

The court refused to give either of the instructions requested, and its refusal to do so is now assigned for error.

By statute in the state of Minnesota, when it is established in cases of this kind that the fire complained of resulted from sparks or cinders thrown from the cars or engines of a railway company, the burden is cast upon the railway company to show that it was not negligent. The statute is in the following words:

"All railroad companies or corporations operating or running cars or steam engines over roads in this state shall be liable to any party aggrieved for all damage caused by fire being scattered or thrown from said cars or engines, without

the owner or owners of the property so damaged being required to show defect in their engines or negligence on the part of their employés; but the fact of such fire being so scattered or thrown shall be construed by all courts having jurisdiction as prima facie evidence of such negligence or defect. * * *" Gen. St. 1894, § 2700.

Under this statute, the presumption of negligence, however, is a disputable one, and may be rebutted by showing that the defendant did use due care, and was not negligent. The defendant was operating its road under lawful authority upon its own land, and could not be made liable for the destruction of the plaintiff's building upon an adjacent lot unless it was negligent in its management or the condition of its engine. The action is based upon the negligence of the defendant, and it cannot be made liable to adjacent property owners for unavoidable or usual consequences of the proper operation of its road. We think the first request was properly refused. The gist of the action is negligence. The evidence shows that this engine was used in the suburban service, pulling a light train, consisting of two coaches; that there was no perceptible grade at the place where the fire occurred; and that the engine was sufficient for the service in which it was used; and the mere fact that, in the ordinary and proper operation of this engine, it would throw out a greater quantity of sparks than would have been thrown out in the ordinary and proper operation of a larger engine doing the same work, and thereby increase the danger from fire to adjacent property, would not of itself amount to negligence. Negligence is a breach of duty, unintentionally and proximately producing an injury to another possessing equal rights. It is the omission to do something which a reasonable man, guided by circumstances which ordinarily regulate the conduct of men in the transaction of their affairs, would do, or the failure to observe for the protection of the interests of another that degree of care, precaution, and vigilance which the circumstances justly demand. A railway company must exercise reasonable care in the use of its property and in the operation of its trains to avoid injury to others; hence the rule requiring "it to avail itself of the best mechanical contrivances and inventions in known practical use which are effective in preventing the burning of private property by the escape of sparks and coals from its engines"; but to say that the use, instead of an ordinary road engine, of a smaller engine, which emitted more and hotter sparks than the ordinary road engine, but which was in every way suitable for the service in which it was employed, and was equipped with suitable appliances, and was carefully operated, was negligence, would be going far beyond the rule applicable to this class of cases. Daly v. Railway Co., 43 Minn. 319, 45 N. W. 611; Frace v. Railroad Co., 143 N. Y. 182, 38 N. E. 102. The two Minnesota cases, Karsen v. Railroad Co., 29 Minn. 12, 11 N. W. 122, and Burud v. Railway Co., 62 Minn. 243, 64 N. W. 562, and Piggot v. Railway Co., 3 C. B. 229, do not change or announce any different rule. The Minnesota cases turn upon the question whether or not there was evidence to support the verdict of the jury, and the court finds that there was. The case of Piggot v. Railway Co. was a different case in its facts from the case at bar. The evidence in that

case was to the effect that the engine in question threw sparks and small particles of coke of an unusual size from the smokestack; that they fell in an ignited state on the premises destroyed, and that there was no contrivance in the way of a netting to arrest the escape of fire from the smokestack, and therefore there was no check on the size of the sparks which might escape. There was also evidence tending to show that the danger might have been avoided by using engines of such power that they need not be worked to their utmost capacity. In this case there is no evidence tending to show that this motor engine was not of sufficient size and capacity to operate the train to which it was attached. On the contrary, the testimony shows conclusively that the engine was not worked to its full capacity, and was entirely sufficient to do the work in the service in which it was employed.

The second request was fully covered by the instructions of the court. The court instructed the jury as follows:

"If you should determine that the evidence satisfies you that the plaintiff has proved the communication of the fire to the building from sparks or cinders from this motor engine, then the burden of proof is shifted upon the defendant, and he must overcome the prima facie case,—that presumption. He must show that there was no defect in the engine: that there was no negligence in the manner of its operation by defendant's employés; and that they were skillful men. In other words, he must prove that there was no negligence, within the definition of the term as I have described it to you. And I told you that negligence was the failure to do something which an ordinarily prudent man under the circumstances would do, or doing something which an ordinarily prudent man under the circumstances would not do. This is the definition of negligence; and it is necessary for the defendant company to show that it used all reasonable and proper care, caution, diligence, and skill in the construction of the motor engine, and that at the time of the fire it was skillfully operated. That is all the railroad company would be required to do,—to use all due and reasonable care and caution in providing appliances for the prevention of the emission of sparks and cinders from the locomotive, and skill in the management of it by its operators at the time."

"Of course, when a railroad company equips its engines with appliances for the prevention of the emission of sparks and cinders, it must have the apparatus complete as far as the appliances used for the prevention of the escape of sparks and cinders from its smokestack are concerned. It cannot comply with the law by merely having the form of the appliance in common use, but it must have the details complete. Everything must be properly constructed, and the appliances must be perfect in form. It must exercise reasonable care and skill in using these expedients for the prevention of fire, and use such expedients as are in common use for the prevention of fire being emitted from its smokestack."

We think these instructions were as favorable to the plaintiff as he could properly ask. There being no error in the record, the judgment of the circuit court is affirmed.